The next case this morning is 523-0151, People v. Isham. Arguing for the appellant is Caroline Borland. Arguing for the appellee is Justin Nicolosi. Each side will have 10 minutes for their argument. The appellant will also have five minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Morning, counselors. Morning. Morning. Apologize, we're a little bit behind schedule. We had some early morning issues. We had to take up housekeeping matters before we started our first case, and then we've had several questions for earlier attorneys. So, appreciate your patience. Ms. Borland, are you ready to proceed? Yes, Your Honor. You may do so. Thank you. Thank you. Good morning, Your Honors. May it please the court, Jeffrey Isham was convicted of a single count of the predatory criminal sexual assault of his 11-year-old niece, A.I. His conviction rests entirely on the credibility of A.I., who was internally inconsistent in reporting her accusations, was contradicted by one of the state's own witnesses, and whose overall claim was implausible. In that context, the trial court failed to ensure that the jurors accepted Jeffrey's presumption of innocence. Likewise, defense counsel repeatedly allowed that presumption to be undermined. As the state concedes, he deficiently allowed graphic other crimes evidence to be presented through hearsay, which the jury was instructed to consider as substantive evidence. Could I stop you for a moment? Could you tell us what our standard of review is in this case? It depends on which arguments there are. Today, I plan on focusing on the second and third argument, and the second argument involves Rule 431B, which will be for plain error. And for ineffective assistance of counsel in Argument 3, it's a mixed standard of review. Defer to any facts made by the trial court, or the ultimate legal question is reviewed de novo. And then for the other issues, which I don't plan on addressing today unless there's questions I'm happy to answer, it would be, for the reasonable doubt, it's light most favorable to the state. And then for sentencing, it would be abuse of discretion. Okay, thank you. Yes. And so, yes, I will start with the first issue, the second issue in our brief, which is our Rule 431B claim. The state concedes that the trial court did not ask any of the 12 jurors if they accepted the principle that a criminal defendant is presumed innocent of the charges against him. Both this court and the Illinois Supreme Court have repeatedly held that failing to ask each juror whether they understand and accept each of the 431 principles is plain error in a closely balanced case. This case was closely balanced. It hinged on A.I.'s credibility. She stated that Jeffrey sexually assaulted her in the bathroom after having come into the living room where she was with all of her siblings and cousins and taking her ponytail and dragging her into the bathroom. That testimony was rebutted by one of the state's witnesses, 11-year-old D.I., who testified he was in the living room at the time. The first thing he heard was A.I. crying in the bathroom and the door closed. He did not provide any testimony corroborating that about this dragging incident that occurred. Of course, another state witness, B.I., did testify. To be clear, though, he did state that his back was turned for at least some brief period of time. Yeah, he says it was turned for a second and then he turned around. And I would say, but she was, A.I.'s testimony was that she was screaming while this was happening. So even if your back turned, it would be something you would hear. And while B.I. did corroborate that, her testimony, the jury could have found suspicious because she added something in that once Jeffrey put A.I. in the bathroom, he closed and locked the door. This is inconsistent with the whole series of events that A.I. testifies that Jeffrey's wife, Kimberly, is just able to come in the bathroom to stop the events. The state actually specifically asked her, did she have to break the door down? And A.I. says no. So the discrepancy in B.I.'s testimony, the jury could easily find, was something that she was trying to fabricate to corroborate her cousin. A.I. herself also gave two stories about these events. She initially told Kimberly only that Jeffrey put his finger inside her private. Then she added later to the forensic interviewer at trial that before that happened, he had first tried to put his penis inside her mouth. Her story was also just inherently implausible. It's not reasonable to believe that Jeffrey, unless he just was ready to go to jail in this case and knew he was going to be caught, would commit this act in the presence of so many witnesses while this was ongoing. Also, there was no physical or forensic evidence. So this case was truly a credibility case. The jury had to resolve these credibilities in light of the discrepancies in the evidence. And it was a closely balanced case in which the 431B error requires reversal. Even worse, the state concedes that Jeffrey's attorney deficiently allowed the jury to receive hearsay discussing graphic other crimes evidence that Jeffrey had allegedly committed against his own daughter, which the jury was also instructed improperly to consider as substantive evidence in this case. The prejudicial nature of this evidence cannot be understated. The jury heard A.I. state three different times during her forensic interview, the entirety of which was played in court, that B.I. had told her, A.I., that Jeffrey would make her, quote, suck his dick, that he would pee in her mouth and force her to drink it, and that he would also put his private and B.I.'s own butt in private. The jury further heard A.I. discuss how B.I. told her that Jeffrey did this to her a lot, or at least that A.I. thought that it happened a lot, that B.I. looked like she was telling the truth when she disclosed this information to A.I., and that Jeffrey's wife, Kimberly, knew about the abuse, had tried to stop it, but was unable to do so. This was far worse conduct from that which Jeffrey was standing trial, and for that reason, the trial court was right to prohibit live testimony about this evidence in court. There are cases, one of them, Smith is a third district case, we've cited it in the briefs, that when you have this other highly prejudicial evidence that's more prejudicial than what you're standing trial for, it shouldn't come in, even for propensity. Yet, even so, trial counsel allowed this to come in through inadmissible hearsay. To be clear, there was no proof that B.I. ever did make these accusations. To A.I., there was no reliability hearing to determine whether she was credible or reliable when she made those statements, we don't know the context. There's also no proof that A.I. was describing this accurately in her forensic interview. And even if this testimony had come in as live evidence, there would be no testimony allowed that A.I., that B.I. looked like she was telling the truth when she made this statement, this evidence is strictly prohibited. And certainly, to allow the evidence that Jeffrey's wife had tried to stop this and was not able to do so, that kind of makes this become a mini trial. And so it would also be improper. It should also be noted that though, rather than being instructed to disregard this evidence, which is conceitedly improper for so many different reasons, the jury was specifically instructed to consider it as evidence in this case of Jeffrey's propensity, intent, motive, and any other sort of reason that was specifically list out. The Illinois Supreme Court has repeatedly held that the erroneous admission of other crimes carries a high risk of prejudice and ordinarily calls for reversal. There's no reason to make this case the exception to that rule. To the contrary, Jeffrey was substantially prejudiced. As I've already discussed, there were several flaws in the state's evidence. The jury could rely on hearsay of other crimes to overlook these problems. And to say, you know what, we're going to resolve reasonable doubt in favor of the state, not Jeffrey, because he looks like he does this a lot. And this is the case where we need to convict him. It should also be noted that this was not a mere sideshow. It was not just inadvertent that this came in. An opening statement, the very first words out of the prosecutor's mouth were that this case was about a family secret involving Jeffrey's ongoing sexual abuse and that it had only come to light, the jury was only hearing about it now because of AI. So the jury was primed and ready to hear this evidence. When they heard AI discussing it, they would have paid close attention to it. Also, where they had been told about AI's, not directly her role in stopping this abuse, but indirectly that it was finally her that made this come to light. It would be up to the jury then, they would know that AI was the cause of all of this and it was up to the jury to solidify that this could finally stop by convicting Jeffrey. There simply can be no confidence in the outcome of a credibility-based trial  so much improper emphasis at trial, or just even admitted at all. Briefly, confidence was further undermined from at least two of the other errors committed by trial counsel, which further undermine this presumption of innocence, that again, the jury had never been questioned on whether they accepted. Specifically, counsel also allowed the jury to hear improperly that Jeffrey's children were currently living in foster care and that AI's parents, one of whom was Jackie Isham, who was Jeffrey's brother, believed her accusations in this case. The evidence that Jeffrey's children were in foster care allowed the jury to surmise that someone like DCFS had come in and made a determination at least that the accusations in this case were substantiated and therefore they had been removed. Of course, that allows the jury to think, okay, there's some stuff going on here that maybe they've looked at that makes them think that he's possibly guilty. Also, the evidence that AI's parents, including Jeffrey's brother, chose to believe her over Jeffrey, further undermine the presumption of innocence because, as the state told them directly in summation, these were the people that knew Jeffrey, that knew AI in real life. They had no beef against Jeffrey. There was no reason not to, you know, for them to kind of be vindictive. And for that reason, the jury should also believe AI was directly asking them to substitute their own determination in this credibility case for that that had been made by those that knew AI and Jeffrey the most. Ultimately, I see my time is running up, so I will, my brief conclusion is that he did not, Jeffrey did not come even close to receiving a fair trial for the reasons set forth in Argument 1. The evidence was so insufficient that this court should reverse that conviction outright, but at a minimum, these errors, many of which are conceded, should require that Jeffrey receive a new trial. Thank you, Ms. Moreland. Other questions, Justice Barberos? I do have one. On page 25 of your opening brief, you indicate that, I found it a little bit confusing, but I think I figured it out. I just wanted to confirm it. Towards the end of the last full paragraph, it says that the state argued that events occurred as AI described, that Jeffrey dragged her into the bathroom and sexually assaulted her too. The defense cited the text to AI's parents that she had walked in on Jeffrey using the restroom and made up a story afterwards. Just to be clear, we're only, my recollection is there was only one text and that was, I guess, I'm not sure if Kimberly testified that she texted AI's mother that AI had walked in on her husband in the bathroom or if there was an additional text, I think AI may have testified that she thought Kimberly had sent a text like that to her mother. There's no other text we're referring to, right? Yes, sorry, I didn't mean to interrupt you. It's my understanding there's only one text and it was AI. The state asked her kind of a direct question and did, like she mentioned, I think Kimberly texted my mom to tell her that and the state confirmed that that happened. So I think there was only the one text. Okay, but there's nothing in the record that I could read where AI ever said to the defendant's wife, I walked in on your uncle in the bathroom. I mean, that was something that Kimberly just either came up with or maybe it never even occurred, I'm not sure. But that's correct. I mean, that Kimberly believed occurred too. It may be not something she came up with, but yeah, it was AI testified that Kimberly sent that text to her parents. Okay, but Kimberly was told by AI, if I remember correctly, AI testified that she told Kimberly precisely what had happened to her in the bathroom, that she had been dragged into the bathroom and that he had attempted to assault her in the bathroom. Is that correct? AI told Kimberly just that, I mean, she talked about the dragging to the bathroom and then she said he put his penis on her, I'm sorry, he put his finger on her vagina. She didn't say anything at that point about any sort of attempt oral sex or anything like that. So is there any explanation or what you're... I didn't even ask you to speculate. Why would Kimberly have texted AI's mother and told her that she walked in on him in the bathroom? In my position, it's because that's possibly exactly what occurred. And it was something... How would she have made that up if AI told her what had happened? I mean, what basis would she have had to suggest, oh, well, she just walked in on her, she didn't really get dragged into the bathroom and assaulted? I mean, we have what AI says she told Kimberly during her forensic interview, and then we don't have anything else to corroborate other than Kimberly's text saying this occurred. So it wouldn't have necessarily, or I don't think even necessarily, it wouldn't have been something that Kimberly just made up. It could have been literally exactly what happened. AI walked in on Jeffrey in the bathroom, she got upset crying. There's really no evidence of exactly what Jeffrey was doing in the bathroom at that time. It could have been something upsetting. So it could have been literally that that's what happened. And defense counsel argued that was what happened in summation in this case and said she was upset because Kimberly yelled at her when she walked in on Jeffrey in the bathroom. So I don't think it's something that... We don't have to infer that Kimberly made that up, but it's her version of what happened, basically. Okay. Kimberly's son, though, when he ran across the street to the grandparents' house, what did he tell his mother was going on that she needed to return home for? He said... I actually have this quote here. He said specifically that he did not know what was happening. He was in sort of a panic mode. See if I can find the quote because I did think that was important to quote. Sorry, I've got this out of order. Okay. He says, I told her like my cousin was in the bathroom crying and I didn't know I didn't know what happened. So that's what he says. Kimberly's rendition is that AI started crying when Kimberly hollered at her for walking in on her husband. That's what AI's text... AI describes Kimberly's text to say. And again, this was just one version for the jury to consider. And also had to consider that there was testimony that AI, DI and all these people, I mean, they had time to talk about this before it happened. And as far as the different renditions of what occurred, I mean, the jury heard testimony that Kimberly had unsuccessfully tried to stop her husband from doing this to his own daughter. And presumably, if you think that that's true, that your daughter's being abused by someone, your husband in particular, he would have gone to the police if your attempt at stopping it wasn't successful. So could the jury have maybe believed that Kimberly wasn't doing enough? And now at this point was trying to make something up as to what she says happened and that AI's version was correct? I mean, I think if the jury made that inference, and that's exactly why Jeffrey should get a new trial because they should have never heard all of this hearsay, AI speculation that Kimberly knew what was happening with BI and didn't stop it. So that's just would be proof that the jury was relying on improper evidence to find Jeffrey guilty. That's why the other crimes evidence was so prejudicial in this case because this was a lot of problems in the state's case. There may have been some issues with whether Kimberly did the right thing. There may have been some issues with whether the defense side was correct, but there were also all of these issues with the state's own case. We have AI's inconsistent statements. We have the DI not corroborating. Let me ask you one last thing. I know you'll have time in rebuttal. So I apologize for belaboring your opening statement. But with regard to the inconsistency of AI statement, are you referring specifically to the fact that when Kimberly showed up, she told her that the defendant had placed his finger in her privates and then later added that he had attempted to place his penis in her mouth? Is that what was the inconsistency? That's her inconsistent statement. Yes, that's what I'm referring to. And the jury could have considered though that in the moment that the door was opened and the assault was stopped, the most graphic, the most shocking, the most upsetting thing, for I believe she was what, nine at the time? Or 11? Yeah, the most horrifying part of the entire encounter could have been her physically being assaulted by having his finger in her. Would that not have, the jury could have considered that that was the most, the thing that was in her mind immediately? And then, I don't know. I'm just trying to figure out. I think that's one interpretation they could make. But again, we're looking closely balanced at prejudice, at least for what I'm arguing today. And another interpretation is if she was so shocked at that time when she's only reporting the thing that she remembered, it's also a little bit suspicious and curious why she would remember when she's telling the forensic interviewer, by the way, I forgot to tell Kimberly this at the time. It shows that she's conscious that she's making a change. And I think that's something for the jury to consider too, because we don't normally say when we're telling something what happened. Oh, by the way, when I said this before, I missed this fact, unless that's something in our mind that we're conscious of. So there's differing interpretations that the jury can make, is my position. Okay, thank you. Thank you. Justice McCain, any questions? No. All right, thank you. Ms. Borland, as Justice Barbera said, you'll have time for rebuttal in a moment. This time we'll turn to Mr. Nicolosi. You ready to proceed? Yes, Your Honor. I do so, thank you. Good morning, Your Honors. May it please the court. Ms. Borland, my name is Justin Nicolosi. I represent the state of Illinois in this case. The state would like to, well, we'll of course address primarily what Ms. Borland discussed, issues two and three. But because these issues, of course, necessarily involve a discussion of the facts, the state's going to start there. As I don't want to read Justice Barbera's mind, I hope I'm pronouncing your name right, Your Honor. I did, thank you. Good, good. But you were discussing at the final part of your discussion with the defense counsel about trying to pinpoint the inconsistency that the defense claimed was part of AI's overall story. The state would submit that, Your Honor, you were pointing at kind of the fact that there really wasn't a significant inconsistency here. And the state submits that, as I argued in my brief, that AI was overwhelmingly a reliable witness, was very consistent between her testimony, which happened two years after her interview with Ashley Turner. Both of those versions of events are remarkably consistent. In part, she testified and told Turner, was dragged by defendant by her hair into the bathroom. She says she was screaming and crying. The defendant put his penis in her mouth. She stopped doing that. But what she could not stop him from doing was placing his finger in her private part of her vagina. Obviously, the state submits, those are the facts here. And though they were consistent every single time, she reiterated her events multiple times to Turner in the video, and it was consistent every time. It's consistent on the stand more than two years later, jury heard these consistencies. This is not a retrial. We're not here to nitpick every part of this young girl's testimony and videotaped interview. As I cite a case in my brief, Solaire talking about that a victim of sexual abuse doesn't have to be perfect or uncontradicted or unimpeached, does not have to be perfect in her testimony. Or do you believe in a case like state submits for her testimony and interview are overall remarkably consistent. So with regard to the consistency of her testimony, the testimony that the defense points out as being inconsistent and may go towards some of the nitpicking you're referring to. For example, the color of the underwear that she had on, whether she had on shorts, jeans or jean shorts, those were, that testimony occurred two years later. It wasn't referred to in the initial examination by the doctor or the agency. Is that correct? I believe that's correct, your honor. You'll have to consult the record. I don't recall specifically if that thing that was discussed in her interview and at the emergency room. I don't believe so, but yes, your honor. Those are the kind of things that, like you had talked about with Ms. Borland at the end of your discussion with her in the heat of the moment when the door is open and the emotions and things are happening. Maybe she didn't tell her every little thing that the defendant did in there. We could all understand how traumatic this must have been for her. Of course, as time passes, there's going to be maybe like details that are mentioned one time before mentioned before, but it wants to focus on the most important parts of her testimony ritual. What it did to her, right? And regarding the trial, very briefly, because I want to get into, I see where I'm almost halfway done. I want to get into the issues two and three that defense counsel focused on the most, but there were items of other testimony and evidence that supported the state's case and the conviction of defendant. Of course, we talked about BI and BI, their testimony. BI typically saw AI being pulled into the bathroom by her hair, heard screaming. BI was in the house at that time, had his back turned, his or her, I don't recall, had that person's back turned and then immediately turned around and saw that the AI who had been there was not there anymore. And the bathroom door had closed and heard AI crying inside. That's when they went and got the mom, which was across the street. These things all put together point to the strength of the state's case here. And defense counsel argued about how this whole case against defendant wasn't rational because why would somebody do this when so many people were around? When the mom was across the street, state argues, well, of course it was going to happen when the mom was across the street and the AI's parents were gone. This is a perfect time to do this. Cases like this, they don't have to be rational. These people who do these sorts of things, they're not rational. They're not thinking of every detail. They're focused on emotion and it almost got away with pulling AI in the bathroom without anybody seeing. But unfortunately for him, at least one of his children saw that. So that's the evidence that the state points out. Let's move on to issue two. State concedes that the trial court did not specifically ask each individual juror whether they understood and accepted the presumption of innocence principle in 431B. As the state, as I argued thoroughly in my brief, the case of People v. Morris, a first district case from 2013, that the judge substantially complied with 431B. And Morris, the trial court said to the entire veneer, we need to find out if you understand and embrace the 431B principles. In this case, the trial court said, we need to find out if you understand and accept the 431B principles. So the court told all of the potential jurors, this is what we're doing. We need to understand and accept all these things. And then when it came to the presumption of innocence, wrong, the court didn't use those exact words. But- I was a trial judge for a number of years before being on the appellate court. And when we go to training, they give you a script and tell you to follow the script. Do you understand the proposition? Do you accept the proposition? And we keep having cases where trial judges freelance and make up their own questions. The appellate court is frustrated with that, but the Supreme Court seems to have said  So is this really even an issue? Is there substantial compliance here? Yes, Your Honor. I believe there was. The trial court told all of the jurors exactly what they needed to understand and accept all of those principles. And immediately thereafter, asked each of the individual veneer persons whether they understood those, that the presumption of innocence is wrong. The state submits based on Morris, which a very, very similar thing happened, as Your Honors can read the case and see my argument brief. Substantial compliance was found in that case. This case is remarkably similar. This court defines substantial compliance. Thank you. Moving on to issue three regarding counsel's ineffectiveness. Again, the state has to concede that the interview with AI should have been redacted, remove all the statements that she made regarding anything that BI had said to her about what the defendant did to her. I'll discuss prejudice here in a second. But the counsel mentioned a couple other things about the foster care reference. As I argued in my brief, the state submits that in light of all of the evidence of trial, there's no prejudice from that remark. That was something that the jury may not have even paid any attention to whatsoever. It was just insignificant in the grand scheme of the trial. Any complaint about whether counsel should have objected to AI's parents testifying that they believed her, the state submits that while those remarks should have been met with an objection, there's no prejudice here because there's plenty of evidence from the trial that AI's parents believed her, told them what happened. They immediately went to police. They didn't even call or text the defendant. There was no testimony of that. They literally just went right to the police. I think there was plenty of evidence regardless of the comments that they believe. There's plenty of evidence that they actually on there. So there were a couple of errors made by counsel with state submits that no prejudice resulted. There's just no reasonable probability that the states would have been different and counsel done the things that defendant complains that he did not do. Again, as I argue the first part of my argument here, the evidence against the defendant was very strong. AI was an extremely credible, liable witness and she was very worthy of belief. There were other pieces of evidence and testimony that support her version of events and support the verdict in the state submits that this could find that the defendant was not doing anything that her parents did. Are there any other questions? I see my time's up. I'd be happy to answer. Thank you. Justice Barbera. Yeah, I did have one question. Could you just very, very briefly address the sentence in this case? Yes, Your Honor. So the defendant was sentenced to 45 years in prison. In this case, this was an extended class act from range of six to 60. So of course that range was, or the sentence given was in the middle. In the right within the range. And of course, the court testified about how defendant's criminal history was a significant aggravating factor. And the state submits that defendant's criminal history is very serious. Four domestic battery convictions, plenty of misdemeanors. Also had three pending counts of predatory criminal sexual assault versus his daughter. I believe it was a BI case that was alluded to in our instant case. You know, the AI, the victim had, she's an Arab, she had significant trauma, of course, from this event. So though, you know, the fact that the defendant still maintained his innocence, even during a statement of an allocution, you know, AI talked about how she was still scared. And it's scared of all men because of what the defendant did. There's plenty of aggravating factors in this case that support the sentence. What about the fact that the state had offered, what was it, six months or some limited amount of time on probation? Well, Your Honor, I don't remember that. Again, I wrote this brief probably six months ago or so, I don't specifically remember. What was that state offering? You know what, I'm not. I think it was a 402 conference. There was a January 6th, 2020 402 conference and probation was mentioned and the court rejected that. So the state was willing to go probation in the beginning. Sure, and Your Honor, I don't remember that. I apologize, but given the PSI and all of the aggravating factors in this case, I don't know if the state's recommendation at that point really matters at this point because it was the trial court that looked at criminal history and the factor of deterrence and what actions did to this family. The state submits that the 45 years that the sentencing court ended up with was prompt on abuse of discretion. Well, in that conference where the limited probation time, I mean, to the judge's credit, he immediately shot that down, said he would not be issuing probation in this case. And then I think later in the case, there was an offer of, I want to remember correctly, 28 years that the defendant rejected. And I think there's an allegation by the defense that the 45 years was kind of a spanking for not accepting the 28. And the court, I believe, clarified that by saying that the court was never made aware of a 28-year offer. My only reason for bringing those two offers up is just to get your opinion on, and I think you've given it now, as to why 45 years as opposed to something less in the 30-year range if the state felt compelled to make that offer. But as I said, you can comment on it further if you'd like, but I think you've already addressed why you think the sentence was appropriate. Sure, Your Honor. I don't think I have anything else to add. If there are any other questions about that issue or any other, I'd be happy to entertain them. Thank you. Thank you. Questions, Justice McKinney? Counsel, the state in its opening statement said this case is about a family secret. The defendant wasn't charged with the family secret, was he? Not in this case, no. But that evidence was given to the juror. Are you saying that wasn't prejudicial? It certainly did not, Your Honor. It certainly did not over... Surely it was prejudicial, of course. All the evidence against the defendant offered by the state was in some way, shape, or form prejudicial, but it didn't overcome the evidence in this case. As I argued in my brief regarding the family secret, that was the opening statement, and that came after the state had filed a motion to present evidence under 115-7.3 regarding other crimes. And state had filed their motion. Defendant did not respond to the state's motion. And then the trial court issued what I would argue is a very detailed and very thoughtful page order about why the court was going to permit such evidence to be presented. Then we get to opening statements, of course. And then the state thinks, and the state even commented later when the judge reversed course on that evidence, the state commented how it believed that it was going to be able to present that evidence. That's why it laid out the framework in its opening statement like it did. So the state fully believed that it was going to be able to present that evidence.  that's certainly not the state's fault at that point in time. It fully believed it was going to go forward in that manner. So yeah, the fact that the state had led the jury to believe it was going to present more evidence, and then some of that evidence was presented by way of that interview that should have been redacted. Of course, that is prejudicial to the defense, but it is not overly prejudicial. It does not counteract all of the strong evidence of this actual crime that the state. All right, thank you. Ms. Borland, rebuttal. Yes, thank you. Okay, I will start by saying AI was not actually totally inconsistent every time she told her story to the forensic interviewer, Turner. There was one point at the end of the very first video, there's four. Turner asked what happened once they got into the bathroom. AI says, he like pulled down my pants in my back and then he like put his finger up my private. And then she said, stop, and was rolling around and came in and opened the door. So there was, at other points in the forensic interview, she did have the allegation, but she was not always inconsistent in that regard. And I would also point out that, again, this isn't just her own inconsistencies. This is the testimony of DI not hearing anything before this crime actually happened. And this story actually is implausible. There was never any point where he could have thought he could have gotten away with this. And especially when AI was screaming as he was dragging her to the bathroom, as AI claimed, he would have certainly known at that point, I'm not getting away with this and not completed the act. From beginning, both before and after this event, AI was either rebutted by a fellow state witness or contradicted by her own testimony. Regarding Morris, Morris is bad law, quite simply. The Supreme Court has held numerous times since then that it's substantial compliance, but substantial compliance requires a question, understand and accept each principle to each juror. And that's substantial compliance and it didn't occur here. And I would also like to note in Wilmington, which is an Illinois Supreme Court case, the very same year as Morris, the trial court also emphasized before questioning,  that each of you understand and embrace these principles. That is that all persons are charged with a crime and presumed to be innocent, et cetera. The state, the trial court still only asked the jurors if they disagreed with the principle and that was clear and obvious error. And I would also note here, though the court said, I'm going to be asking you about both of these principles. It then only asked for the jurors understanding and the very first and second juror who answered that question specifically said, I understand, I understand. So they interpret that to mean I'm being asked now about understanding and possibly I'll be asked later about acceptance. And I would also know Wilmington is not alone. Thompson, Sebi, Belknap, this court and more, all of these cases since then, this court and Mueller, I'm sorry, first district was more, have said that just failing to ask only accept or only understand without the other is clear and obvious error. I would also note to the degree that the state talked about how the jury could infer that AI's parents believed her from the fact that they took her to the police. It was noted by Drew Faulkner, who was the first person to see the family that night, that they reported a possible molestation. This does not necessarily show that they were doing this because they believed her. They could have also just thought they needed to report. And even if they did believe them, it should have been up to the jury to make that determination and not be told directly by the state. You can consider this evidence. I will also address briefly the sentence. The state noted that the sentence is supported by the fact that he was charged with three other crimes against BI. That was not part of the sentencing hearing. He is being tried for those separately. The state did not dismiss those charges. So the sentence here had to be for this sentence. And our allegation, the defense counsel in the trial court said it was a trial tax because of that. Our allegation is that when you have four months offered of probation, and then the sentence offered for 28 years or a cap of 30 was actually for all of the charges, not just against AI, but also for all of those against BI, it just helps support that this is not proportionate to the nature of this offense. And I think the community, the Illinois Constitution requires rehabilitative aim in proportionality to the sentence. When the community hears about 45 years, they're thinking this is a very serious crime or something where the defendant has had a chance to be rehabilitated in the past and he's not done it and he keeps offending. Here, the state does not agree. There's no rehabilitative aim. Jeffrey won't get out of prison till he's 67. And though he had prior domestic batteries in his past, he had nothing like this. He'd never been given sex offender counseling. The crime itself was very fleeting, not the type of thing that you think of when you hear 45 years. And so there was lots of room between four years of probation and 45 years. There was lots of room between 28 years for every charge in this case and 45 years. His sentence is wildly disproportionate. And so we would ask this court to reduce that term. Does this court, I see my time is coming up. Are there any other questions? I can answer. Thank you, Ms. Borman. Justice Barberos? No, thank you. Justice McKinney? No, thank you. Thank you. We appreciate your arguments. We'll consider those arguments and the briefs. We'll take the matter under advisement and issue a decision in due course.